| | | |
|---|---|---|
| COUVILLION GROUP, LLC | * | NO. 2025-CA-0356 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| PLAQUEMINES PARISH GOVERNMENT | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 61-918, DIVISION "B"
Honorable Michael D. Clement,
\* \* \* \* \* \*
**Judge Paula A. Brown**
\* \* \* \* \* \*

(Court composed of Chief Judge Roland L. Belsome, Judge Paula A. Brown, Judge Rachael D. Johnson)


George Pivach, II
Corey E. Dunbar
PIVACH, PIVACH, HUFFT & THRIFFILEY, L.L.C.
8311 Highway 23,
Suite 104
P. O. Box 7125
Belle Chasse, LA 70037-7125

Patrick J. McShane
Danica Benbow Denny
Phoebe A. Hathorn
FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, LA 70163-3600


COUNSEL FOR PLAINTIFF/APPELLEE


Jimmy A. Castex, Jr.
W. Lee Kohler
CASTEX ESNARD, L.L.C.
650 Poydras Street, Suite 2415
New Orleans, LA 70130

Jacque Rene Touzet
Rennie S. Buras, II
PLAQUEMINES PARISH GOVERNMENT
333 F. Edward Hebert Blvd., Bldg. 100
Belle Chasse, LA 70037

    COUNSEL FOR DEFENDANT/APPELLANT

**AMENDED**
**AFFIRMED AS AMENDED**
**JANUARY 7, 2026**

PAB
RLB
RDJ

This is a dispute over delay damages arising from a construction contract. Appellant, Plaquemines Parish Government ("PPG"), seeks appellate review of the district court's April 15, 2025 judgment, which awarded Appellee, Couvillion Group, LLC ("Couvillion"), a total of $2,782,724.31 in damages plus all costs and reasonable attorney's fees, interest from the date of judicial demand and dismissed PPG's reconventional demand with prejudice. For the reasons that follow, we amend the district court's judgment to reflect an award of $82,320.00 for the emergency mobilization and demobilization for Hurricane Isaac; we amend the district court's award of legal interest from the date of judicial demand to the date of substantial completion; and we affirm the remainder of the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

For the sake of brevity, we are outlining only the salient factual history as agreed upon by the parties in their joint *Stipulations of Fact* ("Stipulations"). In August of 2005, Hurricane Katrina slammed into the Louisiana coastline, causing massive destruction in its wake. One of the casualties of the storm was the Port Eads dock facility located near the southernmost tip of Plaquemines Parish.

Several years later, in October of 2010, PPG put out for public bid a project to reconstruct the Port Eads facility (the "Project"). The Project was to include two camps, a new marina with a wooden dock, an icehouse and a fueling facility. Couvillion submitted the lowest bid and was awarded the contract for the Project (the "Contract"). Under the terms of the Contract, Couvillion was required to complete the Project in 395 days. That meant that once PPG issued a notice to proceed on March 1, 2011, Couvillion was required to achieve substantial completion by March 30, 2012.[1]

After a series of change orders, the substantial completion date was revised to August 15, 2012. Also, sometime in early 2012, the Federal Emergency Management Agency ("FEMA") informed PPG that the design for the fuel tank platform might need to be revised to comply with FEMA's base flood elevation requirements in order for the cost of the Project to be reimbursable by FEMA. On April 4, 2012, Tim Hart with Professional Engineering Consultants ("PEC"), PPG's project engineer, informed Couvillion via email that "[w]e have been notified by ASCE[2]/PPG that FEMA is requiring the Fuel Tank Platform to be raised [two] feet above plan elevation" and then requested that Couvillion "[p]lease cease all production of associated materials for the fuel tank platform that might not be usable at the higher elevation i.e., stairs, pile caps." In their Stipulations, the parties refer to this correspondence as the Partial Stop Work Order ("Partial SWO"). The Partial SWO was ultimately lifted when, on November 27, 2012,

---

[1] As defined by the Certificate of Substantial Completion, "Substantial Completion" is achieved when a project is finished enough for an owner to use it for its intended purpose, even if minor "punch list" items remain. Final completion is accomplished once those remaining items are concluded.

[2] All South Consulting Engineers, PPG's project manager.

2

PPG instructed Couvillion to proceed with the work on the fuel tank platform at the original plan elevation.

On November 1, 2013, the Project was formally declared to be substantially complete. Following, counsel for Couvillion sent three separate letters on December 12, 2013, June 30, 2014 and August 13, 2014, making amicable demand on PPG for delay damages and additional expenses. Notably, PEC, PPG's project engineer, issued a memo on October 23, 2014, which concluded that Couvillion was entitled to delay damages and additional expenses in the amount of $1,105,210.91, subject to an offset of $60,000 in liquidated damages due to PPG. After PPG failed to tender any payments, Couvillion filed a *Petition for Mandamus* on January 14, 2015, alleging that, pursuant to La. R.S. 38:2191[3], PPG was liable to: pay any sums PPG had already appropriated for payment to Couvillion; pay the amount of delay damages and additional expenses approved by PEC; and pay court costs and reasonable attorney's fees.[4] After a continuance and ongoing motion practice, PPG filed a reconventional demand on November 5, 2021, alleging, among other things, that Couvillion was at fault for any delays in the Project timeline, and that PPG was entitled to $331,000.00 in liquidated damages for Couvillion's failure to complete the Project on time.

The matter came for a two-day bench trial on July17-18, 2024. A total of four witnesses testified at trial: (1) Timothy Couvillion ("Mr. Couvillion"), owner and CEO of Couvillion; (2) Don Carlow ("Mr. Carlow"), an expert in forensic schedule analysis and critical path methodology, appearing on behalf of

---

[3] Louisiana Revised Statutes 38:2191 will be more fully discussed, *infra*.

[4] On June 16, 2015, Couvillion filed a *First Supplemental and Amended Petition*, which amended the original petition seeking mandamus relief, which is a summary proceeding, to a petition for an ordinary proceeding.

Couvillion; (3) Philip Lachin ("Mr. Lachin"), an expert in project management, forensic scheduling analysis and critical path method analysis, appearing on behalf of PPG; and (4) Michael Carbo ("Mr. Carbo"), accepted by the district court as an expert to provide an opinion regarding forensic scheduling analysis, appearing on behalf of PPG. Prior to trial, PPG and Couvillion had each filed motions *in limine* to exclude the testimony and report of an expert witness ("*Daubert* motions")— PPG sought to exclude Mr. Carlow's testimony and report, while Couvillion sought to exclude those of Mr. Carbo. A brief hearing was held before the commencement of the trial on July 17, and the district court denied both motions. During the trial, neither party objected to the court's acceptance of Mr. Carlow or Mr. Carbo as expert witnesses.

Several months after the conclusion of the trial, both parties submitted post-trial memoranda and proposed findings of fact. On April 15, 2025, the district court rendered judgment in favor of Couvillion and against PPG, finding that Couvillion was entitled to $2,782,724.31 in total damages, plus all costs and reasonable attorney's fees pursuant to La. R.S. 38:2191 and legal interest from the date of judicial demand, and dismissed PPG's reconventional demand with prejudice. In detail, the court awarded damages for the following:

| | |
|---|---|
| Delay damages for 278 days | $2,030,415.00 |
| Extra work for the larger crane: | |
| $10,925/day for 24 days: | $262,200.00 |
| Extra work for the larger crane: | |
| 3 mobilizations at $26,500 each: | $79,500.00 |
| Emergency mobilization and demobilization | |
| For Hurricane Isaac: | $82,300.00 |

4

| | |
|---|---|
| Fuel charge: | $20,427.44 |
| Utility trough cover: | $16,666.60 |
| Subcontractor (Faulk & Meek): | $147,853.86 |
| Subcontractor (Chain Electric): | $143,361.41 |

The district court additionally issued its finding of facts pursuant to La. C.C.P. arts. 1917 and 1812.[5] This timely appeal followed.

## DISCUSSION

PPG offers multiple assignments of error for our review[6]. For efficiency, we will address them in four separate sections: (1) PPG's *Daubert* motion; (2)

---

[5] Louisiana Code of Civil Procedure article 1917 provides, in pertinent part:

> B. In nonjury cases to recover damages for injury, death, or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article 1812 of this Code. These findings need not include reasons for judgment.

Louisiana Code of Civil Procedure article 1812(C) enumerates, in pertinent part:

> In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
>
> (1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
>
> (a) Whether such fault was a legal cause of the damages, and, if so:
>
> (b) The degree of such fault, expressed in percentage.
>
> *   *   *
>
> (3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
>
> (a) Whether such negligence was a legal cause of the damages, and, if so:
>
> (b) The degree of such negligence, expressed in percentage.
>
> (4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.

[6] Specifically, PPG asserted the following assignments of error:

> 1. The [district court] erred in awarding Couvillion damages for the subcontractors' claims.

5

Damages; (3) Additional Compensation; and (4) Attorney's Fees and Interest Pursuant to La. R.S. 38:2191.

*PPG's Daubert motion*

This Court has previously explained that "[u]nder the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),[ ] and adopted by our Louisiana Supreme Court in *State v. Foret*, 628 So.2d 1116, 1122 (La. 1993),[ ] the [district] court is required to perform a 'gatekeeping' function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Leininger v. Heaney*, 23-0574, p. 7 (La. App. 4 Cir. 8/15/24), 414 So.3d 535, 542 (quoting *Allen v. Eagle Inc.*, 22-0386, 0387, p. 9 (La. App. 4 Cir. 8/10/22), 346 So.3d 808, 814-15).

> *Daubert* set forth some non-exclusive factors for courts to consider in making a determination as to whether an expert's testimony was relevant and reliable. Those factors include but are not limited to: (1) the testability of the technique or scientific theory; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique had gained ["]general acceptance.["]

---

2. The [district court] erred in awarding Couvillion delay damages for home office overhead.

3. The [district court] erred in awarding Couvillion attorneys' fees and legal interest under La. R.S. 38:2191.

4. The [district court] erred in awarding Couvillion additional compensation for three "extra" mobilizations of its larger crane barge.

5. The [district court] erred in awarding Couvillion additional compensation for "extra work for the larger crane."

6. The [district court] erred in denying PPG's *Daubert* motion to exclude the testimony of Couvillion's scheduling expert, Mr. Don Carlow.

7. The [district court] erred in finding that Couvillion was entitled to 278 days of compensable delay damages and 43 days of non-compensable delays.

8. The [district court] erred in denying PPG's claim for liquidated damages.

*Harvey v. Hamby*, 23-0084, p. 9 (La. App. 4 Cir. 10/4/23), 376 So.3d 225, 234 (quoting *Hooper v. Travelers Ins. Co.*, 10-1685, 11-0220, p. 4 (La. App. 4 Cir. 9/28/11), 74 So.3d 1202, 1204-05).

"An appellate court reviews a decision to allow or exclude expert testimony under an abuse of discretion standard." *Manuel v. Fat Catz Music Club, Inc.*, 22-0288, p. 9 (La. App. 4 Cir. 8/3/22), 366 So.3d 264, 270 (citing *Donaldson v. Hudson Ins. Co.*, 12-1013, p. 6 (La. App. 4 Cir. 4/10/13), 116 So.3d 46, 51). "Although this standard is highly deferential, when the district court's conclusion is based on an erroneous view of the law or reached in a capricious or arbitrary manner, it is an abuse of discretion." *Id.* (citing *Schwarzenberger v. La. State Univ. Health Scis. Ctr. New Orleans*, 17-0024, p. 7 (La. App. 4 Cir. 8/24/17), 226 So.3d 1200, 1205-06).

Nevertheless, it is well-settled law that "[q]uestions of credibility are for the trier of fact, even when applied to expert testimony." *Johnston v. Vincent*, 21-01196, p. 29 (La. 2/1/23), 359 So.3d 896, 916 (citing *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 12 (La. 7/1/08), 988 So.2d 214, 222). "The trier of fact may accept or reject any expert's opinion, in whole or in part, and may substitute its common sense and judgment for the expert's opinion when the substitution appears warranted on the record as a whole." *Id.* Thus, as this Court outlined in *Lowenburg v. Sewerage & Water Bd. of New Orleans*:

> When presented with testimony from numerous expert witnesses, [t]he law is well-settled [sic] that where the testimony of expert witnesses differs, the trier of fact has great discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. The assessment of credibility of competing expert witnesses is best left to the trier of fact, who has the opportunity to observe the respective demeanor of the witnesses. Where there is evidence before the trier of fact which, upon its reasonable evaluation as to credibility, furnishes a reasonable basis for

the trial court's finding, it should not be disturbed in the absence of manifest error.

19-0524, p. 27 (La. App. 4 Cir. 7/29/20), 387 So.3d 548, 571-72 (quoting *Koepp v. Sea-Land Serv., Inc.*, 93-2562, p. 12 (La. App. 4 Cir. 11/17/94), 645 So.2d 1269, 1276) (internal citations omitted).[7]

PPG argues the district court erred by: (1) admitting Mr. Carlow's testimony because his analysis was inherently flawed and unreliable; and (2) accepting Mr. Carlow's methodology as credible based on his report and testimony. Accordingly, this Court is required to perform a two-part inquiry to determine whether the district court abused its discretion when it allowed Mr. Carlow to testify or was manifestly erroneous when it relied on his methodology to render its judgment.

First, as we previously relayed in this opinion, at the conclusion of the *Daubert* hearing the district court denied PPG's motion to exclude Mr. Carlow's expert report and testimony. Counsel for PPG failed to lodge a contemporaneous objection at that time, did not traverse Mr. Carlow's credentials when he was tendered as an expert witness, and did not object to the district court accepting him in that role. This Court addressed the analogous situation in *Everhardt v. La. Dep't of Transp. & Dev.*, explaining that after the district court denied the appellant's motion *in limine* to strike an expert's testimony and the appellant did not object to the appellee tendering the plaintiff as an expert, the appellant effectively waived any objections it might otherwise have had as to his expert qualifications or the

---

[7] *See also TKTMJ Sewerage & Water Bd. Of New Orleans* (wherein this Court reiterated that "[t]he law is well settled that where the testimony of expert witnesses differs, the trier of fact has great, even vast, discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. Further, the assessment of credibility of competing expert witnesses is best left to the trier of fact, who has the opportunity to observe the respective demeanor of the witnesses") 20-0154, pp. 5-6 (La. App. 4 Cir. 12/16/20), 366 So.3d 276, 283.

admissibility of his expert testimony. 07-0981, pp. 10-11 (La. App. 4 Cir. 2/20/08), 978 So.2d 1036, 1045-46. *See* La. C.E. art. 103(A)(1) (an error cannot be predicated upon a ruling that admits evidence unless a timely objection appears of record). Having failed to lodge a contemporaneous objection to Mr. Carlow's testimony at trial, we find that PPG has waived its right to raise that issue with this Court.

Next, in *Harvey v. Hamby*, this Court emphasized that "there is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived from that application." 23-0084, p. 10, 376 So.3d at 234. "Only a question of the validity of the methodology employed brings *Daubert* into play." *Id.* (quoting *Tadlock v. Taylor*, 02-0712, p. 5 (La. App. 4 Cir. 9/24/03), 857 So.2d 20, 26).

In his report, Mr. Carlow described the approach he employed in order to reach his conclusions as a "retrospective, observational, dynamic contemporaneous delay analysis methodology," and explained that he used various steps in his analysis as it pertains to Method Implementation Protocols ("MIP") 3.3 and 3.4 of AACE[8] International Recommended Practice 29R-03 Forensic Schedule Analysis (the "RP"). It is PPG's position that Mr. Carlow did not and could not properly utilize the methodology laid out in those MIPs because there was insufficient data. Moreover, PPG contends that Mr. Carlow misidentified the task that should have been designated as the critical path.[9] This misapplication of the RP and the critical

---

[8] The Association for the Advancement of Civil Engineering.

[9] See n. 10 for an explanation of "critical path."

9

path, they argue, completely invalidates Mr. Carlow's methodology; therefore, his testimony should have been excluded. We disagree.

According to Section 1.1 of the RP, it was formulated "to provide a unifying reference of basic technical principles and guidelines for the application of critical path method ("CPM") scheduling in forensic analysis."[10] However, there is also a disqualifier, which provides that "[t]his RP is not intended to establish a standard of practice, nor is it intended to be a prescriptive document applied without exception." Additionally, "a departure from the recommended protocols should not automatically be treated as an error or deficiency as long as such departure is based on conscious and sound application of schedule analysis principles." Furthermore, the writers "recognize[d] that the method(s) of analysis to be utilized

---

[10] As it is explained in the Government Contract Guidebook:

> Most of the planning and scheduling of construction projects—especially larger ones—is conducted with the use of Critical Path Method (CPM) analysis. CPM is a scheduling process in which the contractor identifies one or more "critical paths"— that is, tasks that must be completed before work on other tasks can proceed. CPM analysis frequently arises from use of commercially available project management software. The "critical path" is the sequence of work on a project that will take the longest time to complete. Delays that occur in the critical path delay the entire project's completion, whereas delays on noncritical paths do not have this effect. CPM analysis plays a major role in the determination of the government's liability for delays. In the case of delays caused by both parties, if the government's delay occurred on the project's critical path and the contractor's delay was limited to noncritical path areas of the work, the delay will be considered to be nonconcurrent and the contractor will be allowed to recover under the "Suspension of Work" clause.

> Simply put, under a CPM analysis, for any delay found on the critical path, a corresponding delay to project completion will be found. CPM has assumed such importance in determining liability in these cases that boards and courts will likely deny recovery if a CPM analysis cannot be made, or will determine that a contractor's failure to produce its CPM schedule entitles the tribunal to infer that the schedule would be adverse to contractor's delay claim. In one case, the Court of Federal Claims stated that it "cannot rely on the assertions of a contractor, not supported by critical path analysis of the project, to award critical path delay costs."

STEVEN W. FELDMAN, GOVERNMENT CONTRACT GUIDEBOOK § 29:10 (4th ed., October 2025 update) (citations omitted).

in a given situation, and the manner in which a particular methodology might be implemented, are dependent upon the contract, the facts, applicable law, availability and quality of contemporaneous project documentation, and other circumstances particular to a given situation."

At trial, one of PPG's own expert witnesses, Mr. Carbo—who was engaged to analyze the methods of analysis utilized by Mr. Carlow and PPG's other expert witness, Mr. Lachin—testified as to the highly subjective nature of the field of forensic scheduling analysis. This is echoed by the RP, where it is emphasized that "[f]orensic scheduling analysis . . . is both a science and an art. As such it . . . usually requires many subjective decisions." He further testified that, after reviewing both expert reports, he found flaws in each. As a result, given the highly subjective nature of the field and that the assessment of credibility of competing expert witnesses is best left to the trier of fact, we cannot say that the district court was manifestly erroneous or that it did not have a reasonable basis to find Mr. Carlow's testimony and report to be credible and rely upon those to render a decision. This argument is unpersuasive.

*Damages*

*A. Subcontractors' Delay Damages*

PPG argues that the district court erred when it awarded Couvillion delay damages for its subcontractors, Faulk & Meek and Chain Electric, because any claims they might have had against Couvillion had prescribed. As PPG points out, Faulk & Meek sent a demand letter to Couvillion for delay damages on November 5, 2013, while Chain Electric made their demand on Couvillion the following day on November 6, 2013. The record does not reflect that either of the subcontractors

11

have filed petitions to pursue their claims. Citing to La. C.C. arts. 3447[11] and 3499[12], PPG contends that by the date of the trial in April of 2024, any claims that the subcontractors might have had against Couvillion were prescribed after the passage of ten years. Couvillion counters that when it filed suit against PPG, Couvillion acknowledged that the subcontractors were owed for delay damages and that, pursuant to La. C.C. art. 3464[13], that acknowledgment interrupted prescription. In opposition to Couvillion's reliance on La. C.C. art. 3464, PPG offers the case of *Lima v. Schmidt*, 595 So.2d 624, 631 (La. 1992) and La. C.C. Art. 3464, Comment (f) of the 1982 Revision Comments for the premise that even if filing the lawsuit could be considered an acknowledgment, "prescription recommenc[es] anew from the date of interruption . . . ."

In *Roy Anderson Corp. v. 225 Baronne Complex, L.L.C.*, this Court explained that a contractor may include "pass-through" claims in its petition for damages against an owner—those types of claims "have been described as damage claims that subcontractors pass through to the contractor to prosecute an action against the project owner to recover those damages." 17-1005, p. 3 (La. App. 4 Cir. 7/11/18), 251 So.3d 493, 497 n. 6 (citing *Pass-Through Claims in Construction Litigation* (May 29, 2007), https://www.internationallawoffice.com/). Also,

---

[11] Louisiana Civil Code article 3447 provides:

> Liberative prescription is a mode of barring of actions as a result of inaction for a period of time.

[12] Louisiana Civil Code article 3499 directs:

> Unless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years.

[13] Louisiana Civil Code article 346 instructs:

> Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe.

"[W]hen several parties share a single cause of action . . . , suit by one interrupts prescription as to all." *Hosp. Mgmt. Servs., LLC v. Axis Surplus Ins. Co.*, 24-0137, p. 5 (La. App. 4 Cir. 9/16/24), 400 So.3d 236, 240 (alteration in original) (quoting *Louviere v. Shell Oil Co.*, 440 So.2d 93, 96 (La. 1983). "In the context of [an exception of prescription], a 'cause of action' is defined as the 'operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant.'" *Id.* (quoting *Everything on Wheels Subaru, Inc. v. Subaru S., Inc.*, 616 So.2d 1234, 1238 (La. 1993)). "[P]rescriptions affecting that cause of action are interrupted by the suit and remain continuously interrupted as long as the suit is pending." *Louviere*, 440 So.2d at 98. Accordingly, we find Faulk & Meek's and Chain Electric's claims are not prescribed.

### B. Delay Damages for Home Office Overhead

At trial, Mr. Carlow testified that he used the jurisprudentially-created *Eichleay* Doctrine[14] to calculate Couvillion's delay damages incurred for its home office overhead. PPG avers that the *Eichleay* Doctrine is inapplicable because *Eichleay* requires that there be a full stoppage of work by the owner, which was not the case here. Both parties cite the Court of Federal Claims case, *JMR Constr. Corp. v. United States* 117 Fed. Cl. 436 (2014) for its discussion of *Eichleay*. The *JMR* court explained that "[t]he term 'home office overhead' refers to the general administration costs of running a business, such as accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, and depreciation." *Id.* at 442 (citation omitted). "These are indirect costs, 'expended for the benefit of the whole business, [and thus] by their nature cannot be attributed

---

[14] *Appeal of Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA 2688, 1960 WL 538 (1960).

or charged to any particular contract.'" *Id.* (quoting *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed.Cir.2003) (alteration in original).

The *JMR* court went on to expound that "[c]ontractors typically recoup these indirect costs by allocating them to individual contracts in proportion to those contracts' direct costs." *Id.* (first citing *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1057–58 (Fed.Cir.2001); then citing RALPH C. NASH & JOHN CIBINIC, UNABSORBED OVERHEAD AND THE "EICHLEAY" FORMULA: RAMPANT CONFUSION, 16 No. 5 Nash & Cibinic Report ¶ 23 (May 2002)). "But, in the event of a government-caused delay or suspension of work, 'the stream of direct costs against which to assess a percentage [of home office overhead]' is decreased." *Id.* (quoting *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669, 671 (Fed.Cir.1992). Further, the Federal Circuit "has held that the so-called '*Eichleay*' formula is the sole method through which contractors are able to recover unabsorbed home office overhead," and that "[t]he *Eichleay* formula requires that contractors satisfy several 'strict prerequisites.'" *Id*. (citations omitted).

PPG posits that these strict prerequisites demand that in order to recover delay damages for home office overhead there must be a complete shutdown of all work activities. To the contrary, Couvillion directs our attention to the *JMR* court's pronouncement that "[t]he *Eichleay* formula does not 'require that the contractor's work force be idle.'" *Id*. at 443 (quoting *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1057 (Fed.Cir.1993). "It is sufficient, for purposes of establishing standby, if a contractor can demonstrate that work was 'stopped or significantly slowed.'" *Id.* (quoting *P.J. Dick Inc.*, 324 F.3d 1384, 1372–73 (Fed.Cir.2003)).

14

Nevertheless, PPG suggests that Louisiana has adopted the strict requirements of the *Eichleay* Doctrine by way of the case of *Gilchrist Const. Co., LLC v. State, Dept. of Transp. and Dev.*, 13-2101 (La. App. 1 Cir. 3/9/15), 166 So.3d 1045. The *Gilchrist* court analyzed the *Eichleay* doctrine and concluded that a complete work stoppage was necessary for a claimant to be awarded damages for home office overhead. The court noted that "while the *Eichleay* formula is basically a jurisprudential doctrine emanating from the federal courts that has seeped, to a slight degree, into our state court system for adoption, we observe that even use of the formula by our courts has been consistent with the prerequisites previously outlined." *Id*. at pp. 31-32, 166 So.3d at 1065. However, our research into the Louisiana jurisprudence related to the *Eichleay* doctrine yielded only one other case, which was decided by this Court in *Harbor Const. Co., Inc. v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 10-1663 (La. App. 4 Cir. 5/12/11) 69 So.3d 498. In that case, although this Court briefly outlined the *Eichleay* Doctrine, the *Harbor* Court neither approved nor repudiated the doctrine; rather, after considering the testimony of the witnesses and reviewing the record, this Court found that the district did not abuse its "much discretion" in awarding overhead costs. *Id*. at pp. 19-22, 69 So.3d at 509-10. We find the same is true in this case.[15] This argument is unpersuasive.

### C. Liquidated Damages

---

[15] Additionally, "we note that 'the decisions of other circuits are not binding on this Court and are persuasive authority only.'" *Sebble on Behalf of Estate of Brown v. St. Luke's #2, LLC*, 22-0620, p. 12 (La. App. 4 Cir. 3/6/23), 358 So.3d 1030, 1038 (quoting *Shelton v. Pavon*, 16-0758, p. 8 (La. App. 4 Cir. 2/15/17), 212 So.3d 603, 609). *See also Mills Electric, Inc. v. GEC, LLC*, 2019 WL 11718393, *12-13 (V.I.) (wherein that court discussed that, at the time of its writing, only 13 states had cases dealing with *Eichleay* and that not all Federal circuits had accepted the doctrine. As of our writing, fourteen states and the Commonwealth of Puerto Rico have cases dealing with *Eichleay*).

In its appellate brief, PPG asserted that it is owed $324,000.00 in liquidated damages; however, in its reply brief, PPG adjusts that claim to $204,285.96. It arrives at that calculation by subtracting the uncontested claims for the utility trough cover, the fuel charge and the emergency mobilization and remobilization due to Hurricane Isaac. Louisiana Revised Statutes 38:2211(A)(7) defines liquidated damages as:

> [A] fixed sum of damages stipulated in a public works construction contract that are intended to compensate a public entity as a result of a delay in performance by the contractor and may be assessed for a project not being substantially complete within the time provided for by the public works contract.

To justify its claim, PPG relies on the argument it previously offered in relation to what it considers the inherently flawed analysis of Mr. Carlow. Having found that that there was a reasonable basis for the district court to rely on Mr. Carlow's analysis, we find that this argument is unpersuasive.

*Additional expenses*

There are two arguments presented related to the district court's awards of additional expenses for Couvillion's use of a larger crane barge instead of an originally planned smaller crane barge, and three remobilizations of the larger crane.

*A. Use of the larger crane*

PPG argues that, based on the original plans for the Project, Couvillion always knew it would need a larger crane. Couvillion counters that PPG did not offer any witnesses at trial—expert or otherwise—to refute Mr. Couvillion's testimony about the need for the larger crane. We find Couvillion's position to be more persuasive. Our review of the trial transcript divulges that Mr. Couvillion described in great detail the need for the larger crane, which he explained was the

result of the Partial SWO. Weighing this testimony against the record and PPG's contentions, the district court found Mr. Couvillion's explanation to be the more credible one.

As this Court has consistently held, "Louisiana jurisprudence is clear that '[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Kaster, Lynch, Farrar & Ball, LLP v. Meeks & Associates, LLC*, 25-0087, p. 14 (La. App. 4 Cir. 8/8/25), ___ So.3d ___, ____, 2025 WL 2301229, * 6 (quoting *Spears v. Hall*, 24-0075, p. 14 (La. App. 4 Cir. 1/13/25), 414 So.3d 620, 630. "The law is equally clear that when applying the manifest error standard of review . . . an appellate court 'may not simply substitute its own view of the evidence for the [district] court's view, nor may it disturb the [district] court's finding of fact so long as it is reasonable.'" *Id.* (quoting *Spears*, 24-0075, p. 14, 414 So.3d at 630). Finding the district court's determination was reasonable, we conclude the district court did not err.

*B. Remobilizations*

As PPG explains in its appellate brief, mobilization costs are the costs of moving the contractor's men, materials and equipment to the project site to perform the work. It argues that the extra mobilizations were unnecessary because Couvillion chose to use the larger crane on other jobs rather than leaving it on site on standby. Mr. Couvillion countered this assertion when he testified that his decision to relocate the larger crane actually saved PPG tens of thousands of dollars because of the higher daily cost to leave it onsite unused. The district court

17

found Mr. Couvillion's account to be compelling and credible and awarded Couvillion the cost of three mobilizations. We find that this determination by the district court was not unreasonable.

Additionally, PPG avers that the district court erred when it awarded Couvillion one of the remobilizations of the larger crane in addition to the contractually-agreed-upon cost for the mobilization and demobilization related to Hurricane Isaac. PPG argues that this amounts to a double payment. We disagree. Our review of Mr. Couvillion's testimony and the record indicates that the Contract contemplated the use of the smaller crane for the Project. We find that the award for the additional cost of mobilizing and demobilizing the larger crane is neither a double payment nor unreasonable.

Finally, as it relates to the award for the emergency mobilization and demobilization due to Hurricane Isaac, we find that the district court erred when it awarded Couvillion $82,300.00. Our review of the pertinent documents indicates that the agreed-upon reimbursement was $82,320.00. Accordingly, we amend the district court's judgment to reflect that amount.

*Attorney's fees and interest pursuant to La. R.S. 38:2191*

PPG objects to the district court's award of attorney's fees and legal interest pursuant to La. R.S. 38:2191.[16] PPG insists that § 2191 was never intended to apply to judgments on disputed claims awarding additional compensation beyond the appropriated funding. For support, PPG cites to *Wallace C. Drennan, Inc. v. Cantrell*, 23-0193 (La. App. 4 Cir. 10/25/23), 376 So.3d 969, 974, which, as noted by Couvillion in its brief to this Court, does not espouse such a position. In its

_____

[16] Discussed more fully, *infra*.

18

reply brief to this Court, PPG offers two other cases for the propositions that: (1) relief should be denied a contractor when there was no evidence that a public entity has not appropriated funds for payment of a contract; and (2) a mandamus cannot be used to compel a public official to exercise discretionary authority.[17]  However, as we noted earlier in this opinion and PPG recognized in its reply brief, although Couvillion initially petitioned for mandamus relief, in its *First Supplemental and Amended Petition* Couvillion amended its action against PPG to an ordinary proceeding.  As a result, we find PPG's reliance on La. R.S. 38:2191(D) and the cited jurisprudence to be misplaced.

Louisiana Revised Statutes 38:2191 was amended and reenacted relative to the payment of public contracts by Acts 1991, No. 1044, § 1.  It was further amended in 2011 by Acts 2011, No. 184, § 1, and that version remained in effect until the statute was amended again in 2014.  At that time, it provided:

> A. All public entities shall promptly pay all obligations arising under public contracts when the obligations become due and payable under the contract. All progressive stage payments and final payments shall be paid when they respectively become due and payable under the contract.
>
> B. Any public entity failing to make any final payments after formal final acceptance and within forty-five days following receipt of a clear lien certificate by the public entity shall be liable for reasonable attorney fees.
>
> C. The provisions of this Section shall not be subject to waiver by contract.
>
> D. Any public entity failing to make any progressive stage payments arbitrarily or without reasonable cause, or any final payment when due as provided in this Section, shall be subject to mandamus to compel the payment of the sums due under the contract up to the

---

[17] *See Foster Const., Inc. v. Town of Richwood*, 48,171, p. 8 (La. App. 2 Cir. 6/26/13), 117 So.3d 607, 610; *see also St. Bernard Port, Harbor and Terminal District v. Guy Hopkins Const. Co.*, 16-0907, p. 14 (La. App. 4 Cir. 4/5/17), 220 So.3d 6, 15.

amount of the appropriation made for the award and execution of the contract.

It was not until a 2018 amendment via Acts 2018, No. 566, § 1 that any provision for interest was included in the statute. That amendment divided paragraph B into two parts, which then appeared as (additions in bold):

> B. **(1)** Any public entity failing to make any progressive stage payment within forty-five days following receipt of a certified request for payment by the public entity without reasonable cause shall be liable for reasonable attorney fees **and interest charged at one-half percent accumulated daily, not to exceed fifteen percent.** Any public entity failing to make any final payments after formal final acceptance and within forty-five days following receipt of a clear lien certificate by the public entity shall be liable for reasonable attorney fees **and interest charged at one-half percent accumulated daily, not to exceed fifteen percent**.
>
> **(2) Any interest received by the contractor pursuant to Paragraph (1) of this Subsection, shall be disbursed on a prorated basis among the contractor and subcontractors, each receiving a prorated portion based on the principal amount due within ten business days of receipt of the interest.**

This remains the current form of paragraph B.

Louisiana Civil Code article 6 instructs that "[i]n the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary." This Court described the difference in *Home Bank v. Marcello*:

> Procedural laws prescribe a method for enforcing a previously existing substantive right and relate to the form of the proceeding or the operation of the laws. Substantive laws either establish new rules, rights, and duties or change existing ones. Interpretive laws, on the other hand, do not create new rules, but merely establish the meaning that the interpretive statute had from the time of its initial enactment. It is the original statute, not the interpretive one, that establishes the rights and duties.

20

17-0281, p. 8 (La. App. 4 Cir. 10/18/17), 316 So.3d 1161, 1165-66. Our review of Acts 2018, No. 566, § 1 reveals that the legislature was silent as to its intent for the amendment to apply retroactively and because the amended version of La. R.S. 38:2191(B) created new rights and duties, we will apply the law in effect at the time the claim arose.

In its appellate brief, Couvillion relies on the current version of La. R.S. 38:2191, highlighting paragraph A's mandate that public entities are required to pay all obligations arising under the contract when those obligations become due and payable under the contract. Couvillion then relies on paragraph B for its claim that it is entitled to attorney fees and interest. We agree in part and disagree in part.

First, we agree that the delay damages and additional expenses are obligations arising under the contract. La. R.S. 38:2216(H) mandates:

> Any provision contained in a public contract which purports to waive, release, or extinguish the rights of a contractor to recover cost of damages, or obtain equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void or unenforceable. When a contract contains a provision which is void and unenforceable under this Subsection, that provision shall be severed from the other provisions of the contract and the fact that the provision is void and unenforceable shall not affect the other provisions of the contract.

Consequently, implicit in any public contract is a provision allowing for delay damages. Also, as previously discussed, Mr. Couvillion testified that additional expenses incurred for the use and remobilizations of the larger crane were a direct result of the delay caused by the Partial SWO. Considering the circumstances and record as a whole, including the memo issued by PEC that recommended PPG pay delay damages to Couvillion, we do not find that the district court was

21

unreasonable in reaching the conclusion that PPG was without cause to withhold payment on those damages after they came due. Because the statute in effect at the time provided for attorney's fees, we find the district court did not err when it awarded those fees to Couvillion.

Next, as we discussed, the version of La. R.S. 38:2191 applicable to this case did not include the very specific process of calculating interest awards arising under the statute. This does not preclude an award of interest. Couvillion's *First Supplemental and Amended Petition* specifically prayed for legal interest from the date of judicial demand. Pursuant to La. C.C.P. art. 1921, "[t]he court shall award interest in the judgment as prayed for or as provided by law." Louisiana Civil Code article 2000 instructs, in pertinent part:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by [La.] R.S. 9:3500.

"An obligor is liable for the damages caused by his failure to perform a conventional obligation" when "[a] failure to perform results from . . . [a] delay in performance." La. C.C. art. 1994. "In a contractual situation, interest is recoverable from the time the debt becomes due unless otherwise stipulated." *Quality Design & Const., Inc. v. City of Gonzalez ex rel. Berthelot*, 06-2211, p. 11 (La. App. 1 Cir. 11/28/07), 977 So.2d 87, 94 (citing La. C.C. art. 2000). "The time the debt becomes due is the date of substantial completion." *Id.* (citing *Ortego v. Dupont*, 611 So.2d 792, 795–796 (La. App. 3 Cir.1992)). Therefore, we conclude that Couvillion is entitled to judicial interest from the date of substantial completion, and hereby amend the district court's April 15, 2025 judgment to reflect that holding.

22

## CONCLUSION

For the foregoing reasons we amend the district court's April 15, 2025 judgment to reflect an award of $82,320.00 for the emergency mobilization and demobilization for Hurricane Isaac; we amend the award of interest to commence at the date of substantial completion of the Project; and we affirm the remainder of the district court's judgment.

**AMENDED**
**AFFIRMED AS AMENDED**